UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **FALMOUTH SCHOOL DEPARTMENT** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 20-cv-_____ |
| ) | |
| **MR. AND MRS. DOE**, on their own behalf ) | |
| And on behalf of their minor son, ) | |
| **JOHN DOE,** ) | |
| ) | |
| Defendants. ) | |

**Complaint**
(Injunctive Relief Requested)

Plaintiff Falmouth School Department (also referenced as "Falmouth") files this action

against Defendants Mr. and Mrs. Doe,[1] asserting as follows:

**PARTIES AND JURISDICTION**

1.  This is an action commenced under the Individuals with Disabilities Education Act, as

amended, 20 U.S.C. § 1400 et seq. ("IDEA"), supplemented by Maine's laws regarding

education of disabled students, 20-A M.R.S.A. § 7000, *et seq*., and their implementing federal

and state regulations.

2.     This action by the Falmouth School Department involves a challenge to a ruling

by a Maine administrative hearing officer, wherein the hearing officer erroneously concluded:  i)

that Falmouth had failed to provide student John Doe with appropriate special education services

from January 2018 through March 2019 and from September 2019 through February 2020; ii)

that the parents' unilateral placement of student John Doe at a private school in Cape Elizabeth,

Maine would support an order for compensatory education under state and federal special

---

[1]  Plaintiff has filed a Motion to proceed under aliases, which accompanies this Complaint.

education laws; and iii) as a result of these findings, that Falmouth should reimburse John Doe's parents for the tuition and transportation costs they have incurred for the Student's placement at this private school between January 2019 and February 2020.

3. The administrative decision and order were issued on April 6, 2020, by a hearing officer appointed by the Maine Department of Education following a due process hearing conducted pursuant to the IDEA, 20 U.S.C. § 1415(f). He then issued a corrected version on April 11, 2020.

4. This Court's jurisdiction is based upon 20 U.S.C. § 1415(i)(2)(A), 1415(i)(3)(A)-(C), and 28 U.S.C. § 1331.

5. Defendants Mr. and Mrs. Doe reside within Falmouth, and are the parents of John Doe, a 10-year-old child with a disability.

6. In seeking to vacate the hearing officer's ruling and remedial order, the Falmouth School Department is a party "aggrieved by the findings and decision" of a due process hearing officer within the meaning of the IDEA, 20 U.S.C. § 1415(i)(2)(A).

7. Plaintiff Falmouth is the local education agency responsible for providing a free appropriate public education to children with disabilities who are residents of the Town of Falmouth and who are enrolled in its schools.

8. The administrative hearing in this case involved a dispute about whether Falmouth had provided appropriate educational services to John Doe from January 2018 through February 2020, and does not include a dispute about the appropriateness of educational programming before or after that time.

2

## FACTS COMMON TO COMPLAINT

9.      John Doe is 10 years old (d.o.b. 3/19/2010) and resides with his parents, Mr. and Mrs. Doe, in Falmouth, Maine.

10.     John Doe is identified as eligible for special education under state and federal special education laws with the disability of Other Health Impairment.  But John Doe's disability in fact impacts him in three primary ways.  His Other Health Impairment is based on a significant diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD"). In addition, he has dyslexia, which impacts both his phonological processing (processing the sounds of language) and his orthographic processing (processing the written components of language).  John Doe has a low average IQ, measured in a range from 83 to 89.  In addition, other cognitive test measures have been extremely low, with the well-respected Comprehensive Test of Phonological Processing having standard scores in composite areas for John Doe running from 60 to 70 to 76 to 82.  John Doe's rapid symbolic naming was "poor," and his phonological awareness was "very poor."  All of these measures indicate serious limitations on his capacity to develop literacy skills.

11.     The consultant at the Aucocisco School who provides primary oversight for the private programming John Doe has recently been receiving at that school has described him as "consistently inconsistent" and has said that at best they hope that John Doe will become a functional reader by the time he finishes school.

12.     Before entering Falmouth schools, John Doe's parents had him attend kindergarten at the Winfield Children's House, a private Montessori school located in Falmouth Maine.  John Doe did not receive any specialized instruction from that private school, and his

parents did not refer him to the Falmouth schools during that school year for consideration as a possible special education student.

13.     John Doe's parents first enrolled him in public school in Falmouth for the start of his first grade, 2016-2017 school year.  John Doe entered first grade at Falmouth Elementary School as a non-reader, with no foundational literacy skills.  He was not able to identify any lowercase letters and only two uppercase letters.  He could not identify any letter sounds nor could he recognize any sight words.  Falmouth quickly moved John Doe into a Response to Intervention ("RTI") program, which began by mid-September 2016.  Response to Intervention programs are mandated by the State of Maine, and offer students who are struggling to learn an opportunity for targeted intervention prior to referral into special education.

14.     While John Doe was receiving RTI support from Falmouth, the school department also initiated a special education referral for him on October 25, 2016.  On October 24, 2016, John Doe's instructors noted that he was unable to pass the initial Level A of the Fountas and Pinnell Benchmark Assessment System (BAS), used by Falmouth to measure student reading levels.  Teachers reported that John Doe required instruction in all pre-literacy areas.  Because of his ADHD, John Doe also required a great deal of re-direction in the classroom.

15.     Falmouth held its first Individualized Education Program (IEP) team meeting on November 15, 2016, and the team agreed on evaluations to be undertaken.   John Doe's parents signed consent for those evaluations on that same day.  Falmouth then administered the agreed-upon classroom observation, psychological evaluation, and academic evaluation.

16.     John Doe's IEP team reconvened on January 30, 2017, and found John Doe eligible for special education as a student with an Other Health Impairment based on his ADHD. The team also recognized that he met the standards for a specific learning disability, but

concluded that the Other Health Impairment label best summarized his primary disability at that time.  The team approved an IEP that called for specialized instruction in reading, writing, and math, in each case for 30 minutes per day, with goals in each area.

17.     Falmouth and John Doe's parents agreed on April 26, 2017, to amend John Doe's IEP to add in extended school year services during the summer for one hour a day, two times a week, for a six-week summer program.  John Doe's parents had him attend the ESY services offered by Falmouth, although they did not have him attend the final few classes.

18.     John Doe's special education teacher for the second half of first grade and for all of second grade was Robin Seeker, a masters-level special educator.  Ms. Seeker addressed John Doe's reading issues with two Orton-Gillingham-based reading programs.  The Orton-Gillingham reading methodology is one of the most well established research-based platforms for literacy instruction.  Ms. Seeker first used the Orton-Gillingham-based Wilson Fundations program, which focuses on phoneme letter/sound relationships – the initial precursor to reading, and one of John Doe's major deficits when he entered special education.  After a few months with that program, Ms. Seeker concluded that John Doe was in a better place with his foundational letter sounds, and she then moved on to SPIRE, a systematic, multisensory, reading program also based on the Orton-Gillingham methodology.  The SPIRE program is well geared toward both the phonemic and orthographic reading difficulties that John Doe has.  It also addresses the other important components of reading including fluency, vocabulary, and comprehension.  SPIRE uses short and predictable lessons which follow a similar structure for every lesson, which is important for John Doe given his attentional challenges.  In addition, the program is recursive, and regularly requires review of skills that need to be mastered, which is

also essential for John Doe because his "consistently inconsistent" learning style results in him appearing to understand a concept one day, only to struggle with it the next.

19.     Ms. Seeker addressed John Doe's attentional issues in a number of additional ways, beyond the structure of his reading program.  She made use of a star chart reward system to provide positive behavioral supports for on task behavior. She also made use of a well-regarded program called the Zones of Regulation, which assists children in recognizing, measuring, and controlling their own behaviors.  The IEP team in May 2017 also gave careful consideration to a private behavioral/psychological evaluation by Dr. Susan Jarmuz-Smith, and then ordered some additional behavioral observations to occur at the start of John Doe's 2nd grade school year.

20.     John Doe attended 2nd grade at Falmouth Elementary School during the 2017-2018 regular school year.  His IEP team next met on October 12, 2017, shortly into the start of 2nd grade.  The team reviewed the behavioral observations Falmouth had undertaken.  At that point in time, the team agreed to amend the IEP to add goals for increased self esteem and for improved responses to frustrating situations. The team also added participation in a social skills group one time a week for 45 minutes a session.

21.     The IEP team next met for John Doe's annual meeting on January 23, 2018, half way through his second grade school year.  By this point in time, John Doe had been receiving special education for approximately one year.  He had entered special education as a non-reader, having failed to meet the initial, Level A on the BAS reading measure.  From the start of his special education program up through the annual meeting a year later, John Doe had moved through the BAS instructional Level A, through instructional Level B, and was at an instructional

level C, and starting to attempt reading at instructional level D.  On the BAS measurement system, this is approximately a year of gain in a year's time.

22.     John Doe's performance during his first year of special education services demonstrated that his IEP for that year had been reasonably calculated to provide him with meaningful benefits within the least restrictive environment, and that he had in fact received meaningful benefits from that program.

23.     At the annual IEP team meeting on January 23, 2018, the IEP team decided to significantly increase John Doe's specialized instruction in an effort to further increase the rate of his growth.  The team doubled John Doe's reading instruction from 30 minutes a day to 60 minutes a day, increased writing instruction from 30 minutes to 45 minutes a day, kept math instruction at 30 minutes a day, and kept the social skills group that had started in October at 45 minutes per week.  The team updated John Doe's IEP goals to address his continuing needs.  The IEP team also determined that John Doe should again receive extended year services for an hour a session, two sessions a week, for six weeks during the summer of 2018.  At this meeting the team also concluded that John Doe should have adult support in the mainstream classroom, to assist with his attentional issues, in addition to the regular education teacher.

24.     John Doe's parents reported favorably on John Doe's progress at this annual IEP team meeting, based on what they were seeing in his reading performance at home.

25.     Ms. Seeker implemented John Doe's special education program as written for the remainder of his 2nd grade school year, and continued to use the SPIRE reading methodology for the remainder of that school year.  This was the same reading methodology that had helped John Doe obtain a year's gain in a year in his reading skills, as measured by the BAS reading instrument.

26.     By the end of the 2nd grade school year, John Doe had accomplished the instructional level D, and was beginning to work on instructional level E.  In addition, he could spell 56 out of the first 100 high frequency spelling words.  He had moved through Level 1 in SPIRE and into Level 2.    And whereas at the beginning of 2nd grade, John Doe could read only 15 out of the first 40 Dolch sight words; by January 2018, he could read 28 out of the first 60; and by the end of second grade, he could read 109 out of the first 220.  He also was making progress in math and writing.

27.     John Doe's parents chose not to have him attend the summer programming offered by Falmouth during the summer of 2018.  Instead, they privately arranged reading instruction from the Dyslexia Center two times a week for some number of weeks, and tutoring from Allison McLatchie on certain Saturdays during the summer.

28.     John Doe began his 3rd grade year, 2018-2019 school year attending Falmouth Elementary School full time.  At the start of that school year, the IEP team met on September 17, 2018, for a program review.  At that meeting, John Doe's mother reported that John Doe had "hated" his private summer program.  John Doe's masters-level special education teacher for 3rd grade, Karen Dunn, reported that she had observed a regression in John Doe's reading skills over the summer, from his level at the end of 2nd grade.

29.     Ms. Dunn addressed the summer regression she had observed by switching to another research-based reading program – the Wilson program – as a tool to catch John Doe back up to where he had been, but without having to repeat the same SPIRE lessons that he had already used the previous spring.  By mid-October of John Doe's 3rd grade year, Ms. Dunn concluded that the regression issues had been addressed, and at that point she moved back to the

SPIRE program that had proved successful the previous school year.  John Doe's mother also reported in October that she was seeing John Doe independently attempting to read at home.

30.     The IEP team had determined in September 2018 that there should be a follow up staff meeting with John Doe's mother in November to review how John Doe was doing. Falmouth held that staffing on November 30, 2018, with John Doe's mother.  School officials reported in detail on how John Doe was doing.

31.     On December 9, 2018, the Parents obtained a private assessment from Lisa Murphy and Barbara Melnick at the Aucocisco School.  They provided the report from this assessment to Falmouth on January 8, 2019.

32.     Between mid-October when Ms. Dunn had moved John Doe back into the SPIRE program and the end of January at the time of John Doe's annual IEP review, John Doe had moved up in the SPIRE Level 2 program from Lesson 3 to Lesson 7-12b.  Where he had been unable to pass the Level E BAS reading measure in June of 2nd grade, he now was able to pass it in January of 3rd grade.  In addition, John Doe's performance in math was strong, and he had "grown tremendously in his independence and stamina" in writing.

33.     John Doe's annual review occurred over two meetings in January 2019.  At the first meeting, the team reviewed the private evaluation from the Aucocisco School.  In addition, John Doe's parents expressed their dissatisfaction with the programming that he had received for literacy, and they expressed their desire to have a different reading methodology called the Lindamood Bell reading program.  The meeting ended without decisions having been made and with an agreement to reconvene.

34.     At the second meeting for the annual review, on January 22, 2019, Falmouth made a number of new proposals in response to the Parents' requests from the previous meeting.

Falmouth updated IEP goals and other required components of the IEP, an then offered increases in special education reading and spelling instruction, proposing for John Doe to receive 9 hours of instruction per week in those areas.  On top of this, the Team proposed special education writing instruction for 1 hour a week, math instruction for 2.5 hours a week, and social skills instruction for 45 minutes a week.

35.     At this same meeting on January 22, 2019, the Falmouth IEP team also offered to switch the methodology for the reading and spelling instruction from the SPIRE reading program that Falmouth had been using to the Lindamood Bell Seeing Stars reading methodology requested by the Parents.  Furthermore, the Falmouth IEP team offered to have a Lindamood Bell reading expert provide 50 minutes of consultation every other week to the Falmouth instructor who would be using this program.  Falmouth also again proposed summer services for John Doe for the summer of 2019.  This IEP took effect on February 25, 2019.

36.     At this same meeting on January 22, 2019, John Doe's mother rejected that portion of the IEP proposal addressing reading and literacy skills, and informed the team that the family would be pulling him out of the literacy instruction in his IEP, and instead would be placing him for tutoring instruction for the afternoon of each school day at the Aucocisco School, a private school in Cape Elizabeth, Maine.  At that school, John Doe would receive tutoring in the Lindamood Bell Seeing Stars reading methodology.   The parents confirmed this intention by letter to Falmouth Special Education Director Gene Kucinkas dated January 24, 2019, with the move to a partial school day beginning January 28, 2019.

37.     Mr. Kucinkas responded on January 24, 2019, to the letter from John Doe's parents by stating that he and John Doe's teachers would review carefully John Doe's daily schedule to see how the morning/afternoon split could be accommodated.  Then on February 1,

10

Mr. Kucinkas wrote to John Doe's parents at greater length, explaining that John Doe's afternoon departure meant that he would miss an hour of his literacy instruction, but that Falmouth would continue to provide the morning portion of his special education instruction, which would include a portion of special education literacy instruction offered by the IEP team.

38.     On March 4, 2019, John Doe's mother wrote to Falmouth to express her dissatisfaction with Falmouth providing John Doe with any special education literacy instruction while he attended there for half days.  In that same communication, she informed Falmouth that she was removing John Doe from Falmouth schools completely, and placing him full time at Aucocisco.  Mr. Kucinkas wrote her on March 6, and continued to offer John Doe a full day program at Falmouth as developed at the January team meeting.  He stated that he felt the decision to pull John Doe out was made too quickly, only a week after the new IEP went into effect on February 25, 2019.  And he stated that it was his belief that Falmouth had a legal duty to continue providing special education to any student enrolled and attending Falmouth schools, even if attending only a partial day.

39.     John Doe's mother responded by email on March 9, retracting her earlier statement that she was placing John Doe full time at Aucocisco, but now saying she would do so if Falmouth kept offering some special education literacy instruction to him in the morning.  On March 11, Mr. Kucinkas expressed his confusion, and said that special education would remain available for John Doe.  On March 12, John Doe's mother wrote to withdraw her consent for John Doe to be in special education.  As required by law, Falmouth complied with this decision by John Doe's parents, and Mr. Kucinkas sent a Written Notice documenting the family's decision to remove John Doe from any special education services of any kind.

40.     From March 12, 2019 to the present, Falmouth has not been permitted to provide John Doe with any special education literacy instruction, and any literacy instruction received by John Doe has been provided exclusively by tutors at the Aucocisco School.

41.     On March 25, 2019, Falmouth held a 504 team meeting and developed a 504 plan to provide John Doe with accommodations and supports outside of special education during John Doe's partial-day attendance at Falmouth Elementary School.  This plan was in place the remainder of the school year.

42.     On May 20, 2019, John Doe's parents requested an IEP team meeting for the purpose of reinstating John Doe's special education status for the start of his 2019-2020 4th grade regular school year.  The IEP team met on May 31, 2019, reinstating John Doe's special education status for the start of his upcoming 4th grade school year, as requested by his parents. The team agreed on a few changes in the IEP, including folding into the IEP some of the accommodations that had been included in John Doe's 504 plan.  At this meeting, Falmouth proposed certain reading assessments and a functional behavior assessment (FBA).   The parents provided signed consent for the testing on June 24, 2019.

43.     By August 26, 2019, Falmouth still had not heard the family's intention regarding John Doe's attendance at Falmouth schools in fall, and school officials reached out for a response.  On August 28, 2019, John Doe's mother informed Falmouth that John Doe would attend the Aucocisco School in the mornings, not in the afternoons, again splitting his day between two schools.  When Falmouth school officials informed her that John Doe's preferred math class at Falmouth was in the morning, John Doe's mother then responded that he would attend Falmouth in the mornings and Aucocisco in the afternoons.

44.     John Doe did not attend the six-week, two hour a day summer program offered by Falmouth for the summer of 2019.  He instead received an hour a day of tutoring for three weeks, provided by Aucocisco School staff who met with John Doe at the day camp he was attending.

45.     The Aucocisco School issued regular reports on John Doe's performance within his tutorial program.  In the report from February 15, 2019, after 22 hours of 1:1 tutorial instruction with the Lindamood Bell Seeing Stars program, Aucocisco reported that John Doe was "reading at the first grade level with instructional support."  In the report from March 29, 2019, after 40 hours of 1:1 tutorial instruction with the Lindamood Bell Seeing Starts program, Aucocisco reported that John Doe was still "reading at the first grade level with instructional support."  In the report from May 17, 2019, after 86 hours of 1:1 tutorial instruction with the Lindamood Bell Seeing Starts program, Aucocisco again reported that John Doe was "reading at the first grade level with instructional support." And in the report from August 2, 2019, after 99.75 hours of 1:1 tutorial instruction with the Lindamood Bell Seeing Starts program, Aucocisco once more reported that John Doe was still "reading at the first grade level with instructional support."

46.     From February through August 2019, after just shy of 100 hours of 1:1 instruction at the Aucocisco School using the Lindamood Bell Seeing Stars methodology, the Aucocisco School's own reports indicated that John Doe's ability to read text in context remained unchanged, and was still at the 1st grade level with instructional support.  He did not receive any writing or spelling instruction during his tutorials at Aucocisco.

47.     In August 2019, Falmouth's evaluator Dr. Jayne Boulos completed her own reading evaluation of John Doe.  Her test results indicated that John Doe's reading skills remained at the "very poor" level and largely at the 1st percentile.  Assessment of his reading

fluency skills by Dr. Boulos – perhaps the best measure of reading rate, accuracy, fluency, and comprehension – remained all at the 1st percentile, very poor, with a standard score of 62.

48.     John Doe attended 4th grade at Falmouth Elementary School in the mornings during the 2019-2020 regular school year up until early November 2019, but as requested by the Parents, he did not receive literacy instruction from Falmouth during this time.

49.     Falmouth convened the IEP team on September 12, 2019.  At that meeting, the team considered the data in Dr. Boulos' report, as well as reports on how John Doe had been doing in his programming at the Aucocisco School.

50.     At the IEP team meeting on September 12, 2019, Falmouth proposed revising John Doe's IEP as follows: increase his direct instruction in reading from 9 hours a week to 10 hours a week; increase his direct instruction in writing from 1 hour per week to 2.25 hours per week; continue his direct instruction in math at 2.5 hours a week; provide 25 minutes a week of social skills support; continue literacy consultation time by the outside reading consultant for 50 minutes every other week; and continue the accommodations and supports that had been in his IEP, including the shared adult support in the mainstream as needed.

51.     Based on the data received from the Aucocisco School about John Doe continuing to read at the 1st grade level with instructional support while using the Lindamood Bell Seeing Stars program, and based on Dr. Boulos' evaluation results, the IEP team at this September 12 meeting proposed removing its earlier determination to provide literacy instruction with the Lindamood Bell Seeing Stars program.  Falmouth instead proposed that John Doe would receive reading services through "a structured phonological program that addresses reading instruction in a systematic way, that incorporates more oral reading, and that covers aspects of the reading process (decoding/phonological, fluency, encoding, comprehension)."  His IEP continued to

14

include significant instructional time for writing and spelling, instruction that he was not explicitly receiving through the Aucocisco tutorials.

52.     On October 2, 2019, the family filed an initial special education due process hearing, challenging the appropriateness of programming offered by Falmouth.  They later withdrew that request.

53.     On October 9, 2019, Falmouth did another BAS reading assessment, and John Doe again tested on that instrument at an instructional level E – the exact level he was at when he left Falmouth's literacy instruction 9 months earlier.

54.     John Doe continued to attend Falmouth Elementary School in the mornings up through an IEP meeting that occurred on November 1, 2019.   The IEP team met on that date to review the functional behavior assessment completed by Dr. Gretchen Jefferson and the math assessment by Emily Klaczynsky.  After reviewing those evaluations, the Falmouth IEP team proposed the following changes in the IEP:  increase special education instruction in math from 2.5 hours per week to 3.5 hours per week; add additional math goals to the IEP; add consultation time for one hour per month by Dr. Gretchen Jefferson on behavior intervention efforts; and continue literacy consultation by the reading consultant every other week for 50 minutes.  Other services and supports in the IEP would remain the same.

55.     On November 1, 2019, John Doe's parents informed Falmouth that John Doe would be attending the Aucocisco School full time as a private placement, starting November 4, 2019.

56.     John Doe's IEP team met in February 2020 to develop his annual IEP for the next IEP team year, even though John Doe's parents had privately placed John Doe full time at the

Aucocisco School.  The IEP and placement proposed by Falmouth in that annual review process were not at issue in this due process hearing now under appeal.

## THE DUE PROCESS HEARING

57.     John Doe's parents filed for an administrative due process hearing with the Maine Department of Education on January 15, 2020, pursuant to state and federal special education laws.

58.     In the Parents' hearing request, they challenged the appropriateness of John Doe's IEP from the date of the annual IEP meeting in January 2018 up until the development of a new IEP in February 2020.  They did not challenge the annual IEP team process that took place in February 2020 for IEP year starting at that time.  They also did not raise IDEA or other legal issues for the time period running from when the parents had pulled John Doe out of special education programming, beginning on March 12, 2019, up through the start of John Doe's 4th grade, 2019-2020 regular school year.

59.     The Maine Department of Education appointed David Webb as a hearing officer, and he held a due process hearing over five days, on March 2, 3, 4, 5 and 9, 2020.  He issued his ruling in the case initially on April 6, 2020, with a "clarified" order issued on April 11, 2020.

60.     Despite the fact that John Doe had made approximately a year of gain in reading using the SPIRE reading program during his first year in special education, the hearing officer nevertheless concluded that the IEP team decision in January 2018 to increase the frequency of literacy instruction and to continue with the SPIRE reading program had somehow denied the student a free appropriate public education.  The hearing officer also concluded that the IEP team in January 2018 had erred in failing to consider using the Lindamood Bell reading methodology, even though no one (either for the family or the school) was recommending its use at that time.

16

61.     The hearing officer further concluded that the IEP team that met at the start of John Doe's 3rd grade, 2018-2019 school year violated the IDEA when the team failed to order a change in reading methodology to the Lindamood Bell reading program in response to John Doe's regression in reading during that past summer, again, even though no one involved with John Doe was recommending a change to Lindamood Bell. The hearing officer also concluded that Falmouth denied John Doe a FAPE when teacher Karen Dunn at that same time chose to address John Doe's summer regression by using the Wilson program, an Orton-Gillingham-based program that he erroneously believed had been used in the past with limited progress.

62.     The hearing officer ruled that the IEP team's decision at the January 2019 annual meetings to increase services and to switch from SPIRE to the Lindamood Bell Seeing Stars reading methodologies were "a step in the right direction," but also were "too little, too late," despite the fact that team had first received recommendations to attempt the Lindamood Bell methodology only that very same month, in January 2019. As a result, the hearing officer concluded that the programming changes offered during this annual review process also denied the student an appropriate education, even though the team was recommending the very same methodology requested by the Parents and their private school providers.

63.     The hearing officer concluded that Falmouth staff who were scheduled to deliver the Lindamood Bell methodology after the January 2019 annual review were not sufficiently experienced in delivering that methodology, even though these providers had as much or more experience in the methodology than many of the direct providers who would be serving John Doe in his Lindamood Bell Seeing Stars private tutorial program at the Aucocisco School, and even though the Falmouth providers all had much more teaching experience, higher certification

levels, and higher levels of education than the Aucocisco tutors, many of whom were not even certified teachers.

64.     The hearing officer concluded that Falmouth violated the IDEA in September 2019 by removing from the IEP its specific mandate to use the Lindamood Bell reading methodology while also increasing reading instruction, despite the fact that the Aucocisco progress reports up to that time had shown that even after approximately 100 hours of 1:1 instruction with the Lindamood Bell reading methodology, John Doe had not budged from the 1st grade instructional level in his ability to read, and Falmouth's own reading assessments were showing him still reading in the "very low" first percentile.

65.     The hearing officer rejected Falmouth's contention that John Doe's parents had obstructed Falmouth's ability to provide John Doe with a FAPE by failing to have him attend Falmouth's summer programming offers in the summers of 2018 and 2019, by withdrawing him from Falmouth for half of each school day starting in late January 2019, and by completely withdrawing him from special education between March 12, 2019, and the start of his 4th grade, 2019-2020 regular school year.

66.     The hearing officer entered an order for compensatory education to address his finding that Falmouth had denied John Doe a free, appropriate public education from January 2018 up through March 2019, and then from September 2019 up through February 2020.  The hearing officer's remedy was for Falmouth to reimburse the Parents for the documented tuition and transportation costs the parents had incurred for John Doe's attendance at the Aucocisco School, both for the tutorial, partial-day services he received from February 2019 up through November 4, 2019, and for the tuition for full-time attendance from November 4, 2019 up through the end of the current, 2019-2020 regular school year.

67.     The hearing officer also ordered Falmouth to pay for the costs of certain private evaluations obtained by the parents based on his conclusion that Falmouth failed to order additional reading assessments for the Student, despite Falmouth having provided further reading assessments for John Doe by Dr. Jayne Boulos in August 2019.

### Count I
### (Review of Due Process Determination under the Individuals with Disabilities Education Act, 20 U.S.C. § 1415, and 20-A M.R.S.A. § 7207-B)

68.     Plaintiff repeats the allegations set forth in Paragraphs 1 through 67 of the Complaint.

69.     Federal and state special education laws authorize the Court to conduct judicial review of the administrative decision and "to grant such relief as the court determines is appropriate."  This authority includes the power to reverse or vacate some or all of the hearing officer's findings and remedial order that were erroneous and/or violated the law.

70.     The hearing officer committed legal error by failing to apply Supreme Court and First Circuit precedent requiring adjudicators in IDEA disputes to base their determinations on careful assessment of record evidence of the child's own unique circumstances.

71.     The hearing officer erred in concluding that Falmouth denied John Doe a FAPE, when the hearing officer failed to consider John Doe's own unique and individual circumstances as part of his ruling, including the combined effects of the Student's very significant orthographic and phonemic processing disorders and his ADHD, all of which together prevent John Doe from making quicker progress in literacy skills than the record shows him as having made, and because the hearing officer failed to give due weight to evidence of the Student's nearly stagnant development of literacy skills in the 1:1 tutorial program he received at the Aucocisco School after leaving Falmouth's programming.

72.     The hearing officer erred in concluding that Falmouth's IEPs were not reasonably calculated to provide John Doe with meaningful benefits in the least restrictive environment because not a single witness or evaluation report offered that opinion, and not a single witness or evaluation report concluded that Falmouth should have changed educational methodologies sooner than offered, and not a single witness or evaluator concluded that John Doe could have made more meaningful progress if Falmouth had done anything differently than it actually did.

73.     The hearing officer failed to apply the proper burden of proof when he ruled that the Parents had met their burden in the case, even though no witnesses or records presented to the hearing officer offered the opinion that Falmouth had denied John Doe a FAPE in any of the ways alleged by the Parents, or in any other way.

74.     The hearing officer failed to give weight to the state and federal mandate to provide special education services in the least restrictive environment, when he ruled against the Falmouth IEPs while ordering reimbursement for John Doe's private placement at the highly restrictive Aucocisco School, where John Doe failed to progress in literacy skills beyond what he had been achieving at Falmouth Elementary School.

75.     The hearing officer erred by ordering Falmouth to reimburse the Parents for the cost of private evaluations, when Falmouth had provided an appropriate reading evaluation by Dr. Jayne Boulos in August 2019 that no witness criticized in any manner.

76.     The hearing officer erred in concluding that the services provided to John Doe by the Aucocisco School meet the First Circuit's standard to support an order for reimbursement or compensatory education because the direct services were provided by insufficiently trained staff and not by a certified special education teacher and because the Aucocisco School's own reports and data failed to establish rates of progress between February 2019 and February 2020 any

20

different or more accelerated than progress at Falmouth, while also depriving him of his right to attend school in the least restrictive setting within which he is able to progress meaningfully based on his own unique circumstances.

77.     The hearing officer erred in rejecting Falmouth's claim that John Doe's parents had obstructed the IEP team process when they failed to send John Doe to programming offered by Falmouth during the summers of 2018 and 2019, and when they withdrew him from full time attendance at Falmouth Elementary School at the end of January 2019, and then withdrew him fully from special education between March 12, 2019 and the start of the 2019-2020 4th grade regular school year.

78.     The hearing officer violated First Circuit precedent by ordering reimbursement of parent tuition costs as a type of compensatory education relief under the IDEA.

**Wherefore,** Plaintiff Falmouth School Department respectfully requests the Court to enter judgment in its favor, and specifically to award the following relief:

(a)  To reverse, vacate, or amend the hearing officer's orders: (1) that Falmouth failed to provide John Doe with a free, appropriate public education from January 2018 through March 2019, and from September 2019 to February 2020; (2) that Falmouth reimburse the parents as a type of compensatory education for the tuition and transportation costs that the parents incurred for the Student's attendance at the Aucocisco School from late January 2019 through the end of the 2019-2020 regular school year; 3) that Falmouth reimburse the parents for documented evaluation expenses that they incurred; and 4) that Falmouth failed to meet IDEA standards for evaluating John Doe at any point in time.

(b)  To award Plaintiff such further relief as the Court may deem just and proper.

Dated:  June 18, 2020

Respectfully submitted,

/s/ Eric R. Herlan
Eric R. Herlan
Drummond Woodsum & MacMahon
84 Marginal Way, Suite 600\
Portland, ME 04101
(207) 772-1941
erherlan@dwmlaw.com

CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2020, I electronically filed this Complaint with the Clerk of the Court using the CM/ECF system, which will send notification to Richard O'Meara romeara@mpmlaw.com.

*/ s/ Eric R. Herlan*
Eric R. Herlan