**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

FALMOUTH SCHOOL DEPARTMENT,   )
   )
      Plaintiff,   )
   )
v.   )  Docket no. 2:20-cv-00214-GZS
   )
MR. & MRS. DOE, on their own behalf &   )
on behalf of their minor son, JOHN DOE,   )
   )
      Defendants.   )

**ORDER ON IDEA APPEAL**

Before the Court is an appeal under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* The appeal is brought by Plaintiff Falmouth School Department ("Falmouth" or "District"), which challenges a 2020 decision of the Maine Department of Education due process hearing officer ("DPHO" or "hearing officer"). This decision required Falmouth to reimburse Defendants Mr. & Mrs. Doe (the "Does") for certain tuition and evaluation expenses based on a finding that the District failed to offer their son, John Doe, a free and appropriate public education, as required under the IDEA. For reasons explained herein, the Court AFFIRMS the 2020 decision of the DPHO.

I.     **LEGAL STANDARD**

The IDEA generally requires that public school districts provide special education and related services to any child with a disability in conformance with an individualized education program ("IEP"). See Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, __ U.S. __, 137 S. Ct. 988, 994 (2017) (citing 20 U.S.C. § 1401(9)(D)). IEPs are "tailored to the unique needs"

of a particular child" by an IEP team, "which includes teachers, school officials, and the child's parents." Id. The IDEA mandates "a detailed set of procedures" that "emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances." Id. (citing 20 U.S.C. § 1414).

If a dispute arises regarding a child's IEP, the IDEA allows the child's parents to request an impartial due process hearing. 20 U.S.C. § 1415(f). At this hearing, the appointed hearing officer is tasked with determining "whether the child received a free appropriate public education [hereinafter, "FAPE"]." Id. § 1415(f)(3)(E)(i). As the Supreme Court has explained, "for most children, a FAPE will involve integration in the regular classroom and individualized special education calculated to achieve advancement from grade to grade." Endrew F., 137 S. Ct. at 1000.

Any party aggrieved by the final decision from this hearing is permitted to bring a civil action and thereby have a court review the administrative record from the hearing, along with any permitted supplemental evidence. 20 U.S.C. § 1415(i)(2). An IDEA appeal requires a district court to review the supplemented administrative record and make "an independent ruling based on the preponderance of the evidence. However, that independence is tempered by the requirement that the court give due weight to the hearing officer's findings." Johnson v. Boston Pub. Sch., 906 F.3d 182, 191 (1st Cir. 2018) (cleaned up); see also 20 U.S.C. § 1415(i)(2)(c)(iii). Substantively, "a court evaluating whether an IEP offers a FAPE must determine whether the IEP was reasonably calculated to confer a meaningful educational benefit in light of the child's circumstances." C.D. v. Natick Pub. Sch. Dist., 924 F.3d 621, 629 (1st Cir. 2019), cert. denied, 140 S. Ct. 1264 (2020).

## II.    FACTUAL FINDINGS

Mr. and Mrs. Doe are residents of Falmouth, Maine.  Their son, John, attended a private preschool and kindergarten during which time he was initially diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and received occupational therapy services. (A.R. 288.) [1]

### A.  First Grade (2016-2017)

In the fall of 2016, the Does enrolled John, then six years old, in first grade at Falmouth Elementary School ("FES").[2]   Shortly after his enrollment, the District began offering John response-to-intervention ("RTI") services consisting of one-on-one support in reading and math. In October 2016, the RTI meeting minutes noted John's significant issues with reading and writing, describing John's skills in these areas as "at the pre-K level." (A.R. 7, 303, 306.)  That same month, Falmouth referred John for a special education evaluation.  On November 15, 2016, Falmouth convened an IEP team meeting regarding John; that same day, the Does signed the necessary consent forms for the District to evaluate John.

On January 30, 2017, John's IEP team reconvened.  At that time, they determined he was eligible for special education services under the category of "other health impairment" based on his ADHD, and developed an IEP for him. (A.R. 356-66.)  This initial IEP noted that John was reading at instructional Level A on the Benchmark Assessment System ("BAS"),[3] an "early

---

[1] All A.R. cites reference the sealed Administrative Record previously filed with the Court.  See ECF No. 24.  The Administrative Record also includes the full transcript of the March 2020 due process hearing as volumes XVII-XXI. The Court cites to these volumes using the page numbers in the Transcript ("Tr.").

[2] Falmouth Elementary School is one of the schools within the district run by Falmouth School Department.

[3] The BAS is a system used to classify a student based on their independent and instructional reading levels, also referred to as the Fountas & Pinnell Guided Reading Levels.  See A.R. 755 & 2938-40; Tr. 464-65, 471-73; see also Tr. 468-69 (describing the difference in independent level versus instructional level within BAS).  The expectation is that a student is meeting grade level expectations if he is at instructional Level D at the end of kindergarten or

kindergarten level," and set an IEP goal of moving to instructional Level D by February 2018. (A.R. 9, 359.)   In accordance with this first IEP, John began receiving specialized reading instruction from Robin Seeker, a special education teacher employed by Falmouth.  The initial IEP called for ninety minutes of daily specialized instruction divided into thirty-minute sessions on reading, writing, and math.[4]  For the specialized instruction sessions focused on literacy, Seeker began using the Wilson "Fundations" reading program and then merged that with the SPIRE program, a variant of the Orton Gillingham instructional approach.  (A.R. 10; Tr. 473, 481-82.) At that point, John was starting at level one of the SPIRE program and Seeker described John as a "nonreader."[5]  (Tr. 470.)   Beyond offering this instruction through the SPIRE program, Seeker attempted to address John's attentional issues with positive behavioral supports.

On April 26, 2017, Falmouth and the Does agreed to amend John's IEP to add extended school year ("ESY") services under which he would receive two hours of weekly instruction during a six-week summer program.  In the spring of 2017, the Does also arranged for their son to have a psychological evaluation related to his attention and social-emotional behavior.  The evaluation diagnosed John with ADHD and, in relevant part, also explicitly recommended direct instruction to improve phonological processing.  (A.R. 11, 391-92.)  The IEP team met and reviewed this evaluation, along with John's progress, on May 30, 2017.  (A.R. 395-96.)  At that time, the progress notes indicated that John was "reading at the instructional level C on the BAS" and working on basic sight words. (A.R. 435.)

---

beginning of first grade.  See A.R. 2938.  By the end of first grade, the BAS expects that a student is meeting instructional reading expectations if he is Level J on the BAS.  Id.; see also Tr. 469.

[4] In light of this one-on-one specialized instruction, the initial IEP estimated that John would spend approximately 77 percent of his time in a regular grade level classroom.  A.R. 366.

[5] The SPIRE program has eight levels and would normally be completed in approximately two years. A.R. 15 n.11; Tr. 488-91, 541, 571-72.

Over the summer, John attended most, but not all, of the ESY sessions offered pursuant to his IEP.  (A.R. 12, 1259-61; Tr. 114-15.)

### B.  Second Grade (2017-2018)

In the fall of 2017, John started second grade at FES.  In accordance with his IEP, John continued to receive specialized instruction with Seeker, the same special education teacher that he had worked with the prior school year.  In response to John's negative behaviors, Falmouth increased behavior supports for John.  On October 12, 2017, Falmouth convened an IEP team meeting that resulted in further amendments to John Doe's IEP to add direct instruction in social skills and modified homework.  (A.R. 417.)

In her November 9, 2017 progress report, Seeker wrote that John "is currently able to read" at BAS instructional level C, a level associated with the "end of kindergarten." (A.R. 13, 435.) But, she still anticipated that he would meet his IEP goal of level D by January 2018.  (Id.)  In contrast, the November 2017 progress report on math, while noting ongoing challenges related to John's ADHD, indicated that he was "keeping pace" with the grade-level math curriculum.  (A.R. 433.)  While work on a behavior plan continued, John made at least two concerning self-harm statements to Seeker in January 2018, which prompted a team intervention at school as well as communication with Mrs. Doe. (A.R. 2468-72, 2489.)

The IEP team next met for its first annual review of John Doe's IEP on January 23, 2018. (A.R. 445-58.)  At that time, the progress note indicated that John was "reading instructional levels C and D books in the resource room, which is an end of kindergarten reading level."[6] (A.R. 435.)

---

[6] Notably, this reflected little change from the May 26, 2017 progress note, which indicated John was then "reading at the instructional level C" on BAS. A.R. 435.  The Court notes some apparent confusion as to what John's BAS

Also, it was reported that John had increased to spelling 50 out of 100 words on the Rebecca Sitton spelling list.[7] (A.R. 448.)  At that time, Seeker indicated that John's "biggest challenge [was] in the orthographic area."  (A.R. 442.)  The progress note for writing acknowledged that John was "writing at an end of kindergarten level" and required significant teacher support on writing tasks.  (A.R. 448.)  Given these results, the IEP team agreed to increase the amount of daily specialized instruction in reading and writing.[8]  (A.R. 13, 457.)  However, achieving a specific BAS level was removed as a measurable goal from the January 2018 IEP and replaced with a goal that over the next year he would be able to read unspecified "unfamiliar text with 90% accuracy." (A.R. 452.)  By June 2018, John was somewhere between a BAS level C and D.[9] (A.R. 14, 1420-23; Tr. 539-41.)  He had progressed to SPIRE level 2, which Seeker viewed as slow progress.[10] (A.R. 15.)  With respect to sight words, it was noted that John could then spell 56 out of 100 high frequency words on the Rebecca Sitton list, which reflected a gain of six words since January. (A.R. 509.)

In lieu of attending any summer programming offered by Falmouth, the Does arranged for John to have tutoring at the Children's Dyslexia Center, as well as weekly visits with an educational therapist, in the summer of 2018.  (A.R. 16, 472, 478.)

---

level was in January 2018.  See A.R. 442 (noting that John was "currently reading at a level A on the Benchmark Assessment System"); Tr. 525-28, 532-33, 597-98 (describing apparent errors in this document).

[7] The Sitton list consists of high frequency sight words.  Notably, Dunn testified at the due process hearing that she conducted one assessment of John in January 2019 where he got fewer than 50 words correct.  Tr. 798.

[8] As a result, this January 2018 IEP estimated that John would spend 63 percent of his time in his grade level classroom. A.R. 458.

[9] While BAS level was removed from John's IEP as a measurable goal in January 2018, Falmouth was still measuring BAS for each student, including John.  See Tr. 620-21, 675.

[10] In fact, it took John approximately 13 months (with an intervening summer break) to complete SPIRE level one. Seeker could not recall ever having a student take that long to complete level one, although she attributed the problem to "behavior . . . and extreme attention difficulties."  A.R. 586-87.  All told, Seeker provided John approximately 18 months of SPIRE-based instruction.  Tr. 1025.

### C.  Third Grade (2018-2019)

In the fall of 2018, John began third grade at FES.  In connection with the start of third grade, Mrs. Doe expressed her concerns about John's lack of progress directly to John's teachers and asked about other potential programming options.[11]  (A.R. 2515-16.)  When those concerns were shared with Falmouth's Director of Special Education, Gene Kucinkas, he acknowledged in a follow-up email to the Superintendent that this student presented a "'slow growth' situation complicated by [his] limited ability to focus" and that John's parents were "appropriately concerned and advocating for their child."  (A.R. 2524.)  He also responded to Dunn with some questions, including:  "What concrete changes can we make (LMB,[12] other programming, increasing time of service . . . consultation)?" (A.R. 2517.)

John's IEP team met for a review of his programming on September 18, 2018. At this meeting, Mrs. Doe again expressed her concerns about John's lack of progress.  Karen Dunn, John's third grade special education teacher, indicated John had lower than anticipated reading skills based on her evaluation and noted some apparent regression in his reading skills.[13]  (A.R. 17, 477.)  Mrs. Doe asked Kucinkas and other members of the IEP team about other potential alternative reading programs.  While no alternative programs were suggested, Falmouth knew that there were reading programs designed to address orthographic processing[14] deficits based on the

---

[11] In an email to Dunn, Mrs. Doe indicated that she was "really concerned about [John's] self-esteem and that John was "very aware that he is not keeping up with his peers in reading and writing." A.R. 2515; see also Tr. 146, 180.

[12] LMB was a reference to Lindamood Bell Programming.  Tr. 1064.

[13] According to Dunn's initial assessment of John in fall 2018, John was still working on SPIRE level one.  Tr. 753-54.  Dunn eventually assessed John as having achieved SPIRE level one in January 2019.  Tr. 762.

[14] Orthographic processing refers to the skills necessary "to store and recall the visual forms of letters and words." A.R. 2607.  By contrast, phonological processing refers to "the ability to perceive, order and manipulate the sounds within words." A.R. 2608.

District's recent experiences with other similarly situated students.[15]  (Tr. 768.)  The IEP team did

agree to add audio books to John's IEP as an accommodation.  (A.R. 477.)  As the meeting closed,

Kucinkas suggested to Mrs. Doe that she seek out support for future IEP meetings.  (Tr. 149, 1072.)

Dunn did initially use Wilson materials for her specialized instruction with John as a way

to address his apparent reading regression, although she later returned to using the SPIRE program.

(A.R. 17-18; Tr. 672.)  With respect to sight words, her November 2018 progress note indicated

that John had only 12 new sight words and that it would be challenging to meet the IEP goal of

mastering the first 100 words on the Sitton list.  (A.R. 509.)  On November 30, 2018, a follow-up

meeting with Mrs. Doe was held to review John's progress.

On December 9, 2018, the Does obtained a private evaluation from Lisa Murphy and

Barbara Melnick at the Aucocisco School.  (A.R. 19, 2605-11.)  This evaluation suggested that

John had "double deficit dyslexia," meaning John struggled with both orthographic processing and

phonological processing.[16]  (A.R. 2605, 2610; Tr. 25, 55.)  The evaluation assessed some core

reading skills to be at the "pre-k to kindergarten levels."  (A.R. 2609.)  Murphy indicated that John

was still a "nonreader" at this time.  (Tr. 24.)  This evaluation made detailed recommendations

explaining that "[g]iven his complex profile, advanced grade, and lack of response to prior

interventions, intervention should be intensive and one on one." (A.R. 2610.)  The Does provided

the Aucocisco evaluation to Falmouth in early January 2019.

---

[15] Specifically, by fall 2017, Falmouth was already involved in a due process hearing involving another student whose parents claimed that Falmouth was failing to implement IEPs that addressed orthographic processing disorder.  On October 31, 2017, Falmouth received an order in that case that concluded that it had failed to provide this student with a FAPE.  See Def. Ex. A (ECF No. 35-1), Page ID #s 275-77.  In that case, the hearing officer ordered reimbursement for the parents' private placement at Aucocisco School, which had offered the student instruction utilizing the Lindamood Bell Seeing Stars program.  Id. at PageID #s 273-74, 282-83.  Similar to John, Falmouth had provided that student only with Orton-Gillingham-based phonics instruction.

[16] Reflecting back on the two years she worked with John, Seeker also described him as having "double deficit dyslexia" or perhaps "triple deficit," which would reflect that John's attentional deficit in addition to phonological and orthographic deficits.  Tr. 479, 568-69.

By January 2019, Dunn noted that John had only added a total of 15 sight words thus far that school year and, thus, would not meet the sight word instructional goal listed in his IEP. (A.R. 22, 509.)  As to learning new words, Dunn noted that John required "significant repetition . . . due to challenges with orthographic processing." (A.R. 535.)  At that time, he was listed as achieving "BAS instructional level E (early first grade)." (A.R. 497 & 533.)  In a January 11, 2019 email to her colleagues, Dunn wondered whether John might benefit from an assessment of "visual perceptual skills" or "direct work with an OT" because John continued to have issues with distinguishing similar letters such as "q" versus "p." (A.R. 22, 2568.)

That same month, two IEP team meetings were held as part of John Doe's annual review. At the first meeting, the team reviewed the Aucocisco evaluation, including its recommendations for reading instruction.  In connection with that meeting, the Does submitted a written statement of concern that highlighted their concerns about John's "slow progression" and some "regression" on goals listed in the IEP. (A.R. 2588.)  They also noted that the Aucocisco evaluation indicated "substantial unrecognized orthographic processing deficits" that were greater than they had expected. (Id.)  The Does explicitly asked that John's reading instruction include the "Lindamood-Bell curriculum of LIPS followed by/overlaid with the Seeing Stars Program," as recommended in the Aucocisco evaluation. (A.R. 23, 495.)

When the IEP team reconvened on January 22, Falmouth proposed increasing John's specialized programming, including some instruction using the Lindamood Bell Seeing Stars program, as requested by the Does and recommended in the Aucocisco evaluation.[17] (A.R. 530-43.)  As part of this proposal, Falmouth also recommended that John would have nine hours of this

---

[17] As a result of the increased specialized programming, the January 2019 IEP estimated that John would spend approximately 59 percent of this time in a regular classroom setting with non-disabled peers.  A.R. 543.

specialized instruction each week with a different reading teacher.  Falmouth proposed to support this instruction by having a "Lindamood Bell/LiPs certified trainer" observe and consult for 50 minutes every other week.[18]  (A.R. 518.)  This January 2019 IEP reintroduced BAS level as a measurable goal and indicated that John would achieve BAS Level I-J by February 2020.  (A.R. 536.)

The Does considered Falmouth's proposed plan for reading instruction inadequate.  At the January 22 meeting and by letter dated January 24, 2019, the Does notified Falmouth that they intended to place John at Aucocisco for the afternoon portion of his school day beginning on January 28, 2019, so that he could receive intensive reading instruction, as outlined in the Aucocisco evaluation.  More specifically, Aucocisco was prepared to then provide John one-on-one reading instruction using the LiPS/Seeing Stars Reading Program for two hours a day, five days per week. (A.R. 524.)

Kucinkas responded to the Does via a letter dated February 1, 2019, in which he explained how Falmouth would implement John's updated IEP in light of their decision to place John at Aucocisco School for the latter half of each school day. (A.R. 527-28.)  In short, Falmouth proposed to still provide John specialized instruction in math, reading, and social skills, which would necessarily further limit his time in his regular third grade classroom.  For their part, the Does requested that John remain in his classroom for general instruction while attending FES for the first half of his school day.  Ultimately, Falmouth refused to accommodate this request for

---

[18] The record includes a partial transcript of this IEP meeting in which Kucinkas and the proposed teacher, Shar Mahoney, explain Falmouth's proposal and endeavor to address specific questions and concerns from Mrs. Doe and the advocate who attended with Mrs. Doe.  Tr. 2943-45.  Additionally, the administrative record includes a full audio recording of the January 22 IEP team meeting, which the Court has reviewed.

mainstreaming.[19] (Tr. 1088.)  Thus, in order to allow John to remain with his regular third grade class, the Does revoked their consent for services under the 2019 IEP and instead requested that a 504 plan be developed for their son.[20] (A.R. 24, Tr. 174-77.)  By March 25, Falmouth implemented a 504 plan to accommodate John's partial day attendance in his third grade classroom.  Thus, for the remainder of that school year, John spent half of his time in a regular FES classroom with no specialized instruction and the other half at Aucocisco.

On May 20, 2019, the Does requested an IEP team meeting for the purpose of reinstating John's special education status for the following school year, when John would be in fourth grade. On May 31, 2019, the IEP team met and reinstated John's special education status for his 2019-2020 school year.  In connection with this meeting, the Does provided Falmouth a parental statement of concern (A.R. 576-77), along with a neuropsychological evaluation report (A.R. 578-91), which was based on testing by Dr. Marcia Hunter in February and March 2019.  The Hunter evaluation included a number of instructional recommendations, including "specialized teaching in the pairing of auditory and visual processing of sounds (i.e. Lindamood Bell programs)."  (A.R. 25, 588.)  The team agreed on changes in the IEP for John's fourth grade year, including folding into the IEP some of the accommodations that had been included in John's 504 plan.  At this meeting, Falmouth proposed certain reading assessments and a functional behavior assessment. The Does provided signed consent for this testing on June 24, 2019.

During the summer of 2019, John did not attend the summer programming offered by Falmouth.  Instead, the Does arranged for John to receive an hour a day of tutoring for three

---

[19] Notably, Kucinkas testified that he understood that time John spent in a mainstream setting was important for John's self-esteem and it was important to strike a balance for John between specialized instruction and mainstream classroom time.  Tr. 1026.

[20] A "504 plan" is named after Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).  These plans provide accommodations that allow a disabled student to participate in public school and access general education, but do not provide specialized instruction.

weeks at his day camp.  This tutoring was provided by Aucocisco staff.  In July 2019, Aucocisco evaluated John to determine what progress he had made based on 100 hours of Seeing Stars instruction.  (A.R. 25-26, 610-13.)  This evaluation documented gains in phonological awareness, orthographic reading, and comprehension.  (Tr. 43-44.)  However, as had been noted in earlier progress reports from Aucocisco, John was still reading "at the first grade level with instructional assistance."  (A.R. 529, 2652, 575, 614.)  The progress reports did note gains in John's sight words.  (Id.)  In August 2019, Falmouth referred John to Dr. Jayne Boulos for a reading evaluation.[21]  (A.R. 26.) This Boulos report (A.R. 616-20) concluded that John's reading skills remained "well-below average skill level across all core domains."[22]  (A.R. 619.)   She recommended an evaluation from the Children's Dyslexia Center, where John had gone previously.  (A.R. 620.)

### D.  Fourth Grade (2019-2020)

In response to an inquiry from Falmouth in August 2019, the Does communicated their intention that John would again be splitting his school days by attending fourth grade at FES each morning and Aucocisco each afternoon.  Falmouth convened John's IEP team on September 12, 2019.  The Does provided a statement outlining their ongoing concerns.  (A.R. 636.)  At this IEP meeting, the team considered the data in the recent Boulos report, as well as reports on how John had been doing in his programming at the Aucocisco School.  Falmouth proposed various changes to John's IEP, including 12.25 hours of direct instruction per week in

---

[21] Dr. Boulos had previously worked for Falmouth.  A.R. 1055.

[22] Notably, this Boulos evaluation included another administration of the GORT-V, which had also been administered as part of evaluations by Aucocisco in December 2018 and July 2019.  All three administrations found John to be in the first percentile for oral reading, but some gains were noted in the 2019 evaluations.  Compare A.R. 2609 (December 2018), with A.R. 612 (July 2019) & A.R. 618 (August 2019).

literacy, 2.5 hours of weekly math instruction, and 25 minutes per week of social behavioral support.[23]  (A.R. 26, 638.)  They also indicated that the reading goals would be amended such that Falmouth would offer John no instruction using the Lindamood Bell Seeing Stars program.

On October 2, 2019, the Does filed an initial special education due process hearing, challenging the appropriateness of programming offered by Falmouth.  They later withdrew that request.  Also, in October 2019, Falmouth assessed John's reading skills.  At that point, John was at BAS instructional level E (early first grade), which was noted to be the same BAS level he had in January 2019.  (A.R. 694.)  An updated math assessment completed in October 2019 reflected John having below grade level math skills.  (A.R. 724-27.)

The IEP team next met on November 1, 2019 to review the recent math assessment, the functional behavior assessment completed by Dr. Gretchen Jefferson (A.R. 681-88), as well as an observation report from Vicky Papageorge (A.R. 664-77), which the parents had requested.  (A.R. 692-97.)  In advance of this IEP team meeting, the Does outlined their multiple concerns in writing, including their views that John required a full-day placement at Aucocisco.  (A.R. 690-91.)  At the meeting, Mrs. Doe credited the instruction John had received at Aucocisco as the reason John was "becoming a reader."  (A.R. 696.)

Based on her observations of John at both FES and Aucocisco, Dr. Jefferson explained that John "had a difficult time transitioning [and] settling into task" and that John's focus could be lost when he was given too many breaks.  (A.R. 693 & 695.)  Similarly, Papageorge observed John was "more focused and attentive" early in her observed sessions and that "time of day in which direct reading instruction occurs" impacted his performance.  (A.R. 677.)  After reviewing all of

_____

[23] As amended in September 2019, John's IEP estimated that he would spend approximately 53 percent of his time in a regular classroom setting.  A.R. 656.

the updated reports, Falmouth proposed the following changes in the IEP: increase special education instruction in math to 3.5 hours per week; add additional math goals to the IEP; add consultation time for one hour per month by Dr. Gretchen Jefferson on behavior intervention efforts; and continue literacy consultation with a reading consultant every other week for 50 minutes.[24]  (A.R. 693.)  At this meeting, the Does rejected Falmouth's proposed IEP and informed Falmouth that John would be attending the Aucocisco School full time as a private placement starting November 4, 2019.  (A.R. 27.)

As a full-time student at Aucocisco, John began receiving three sessions of specialized reading instruction each day and also attending other small group classes in math and science.  (A.R. 2698, Tr. 197.)  His homeroom group was five students, all fourth and fifth graders.  (Tr. 346-47.)  Papageorge conducted a classroom observation of John over two days in early 2020.  (A.R. 2918-36.)  She noted "significant improvement in [John's] overall reading ability" as compared to her initial observation in October 2019.  (A.R. 2936.)  Nonetheless, she recommended continuing ongoing supports, including "immersion in the Lindamood Bell programs for phonology and orthography for reading development."  (Id.)  In January 2020, Aucocisco updated John's reading assessment after 289 hours of LMB instruction.[25]  (A.R. 27, 730-34.)  This assessment reflected "growth in foundation skills for reading" but "continuing signs of mixed

---

[24] As proposed in November 2019, John's IEP contemplated that half of his time would be spent in a regular classroom setting.  A.R. 713.

[25] Murphy acknowledged that that it was rare in her experience for students to require more than 300 hours of Seeing Stars instruction but also indicated she previously has seen cases where 400-500 hours of Seeing Stars instruction were needed.  Tr. 55-56; see also A.R. 524 (recommending 300-360 hours of instruction).

Phonological and Orthographic Dyslexia." (A.R. 733.) By March 2020, Barbara Melnick testified that John was reading at mid-second grade to early third grade level.[26]  (Tr. 337.)

### E.  The Hearing

John Doe's parents filed for an administrative due process hearing with the Maine Department of Education on January 15, 2020.  In their hearing request, they challenged the appropriateness of John Doe's IEP from January 2018 (the date of his annual IEP meeting) up until February 2020 (when a new IEP was developed).[27]  A due process hearing was held over five days, on March 2, 3, 4, 5 & 9, 2020. The DPHO issued his initial ruling in the case on April 6, 2020, with a "clarified" order issued on April 11, 2020.

### F.  The Decision

The hearing officer concluded that Falmouth had failed to offer John Doe a free appropriate public education for two distinct periods: (1) January 2018 through March 2019, and (2) September 2019 through February 2020.  (A.R. 51.)  In relevant part, the hearing officer concluded that "by January 2018, it was clear that [the SPIRE program] was not a plan that was reasonably calculated to provide [John] with a FAPE."  (A.R. 42.)  Likewise, the hearing officer found that "the September 2019 IEP was not reasonably calculated and reasonably ambitious to enable [John] to make appropriate progress in light of his circumstances."  (A.R. 46.)

---

[26] For her part, Lisa Murphy testified that they were still setting a goal of John reading at grade level and becoming a "functionally literate student." Tr. 56.

[27] John's IEP team met in February 2020 to develop his annual IEP for the next year, even though John Doe's parents had privately placed John Doe full time at the Aucocisco School.  The IEP proposed by Falmouth as a result of the February 2020 annual review process was not challenged by the Does as part of this due process hearing.  Also, the Does did not assert denial of a FAPE for the time period running from March 12, 2019, when the parents had pulled John Doe out of special education programming, up through the start of John 's regular 2019-2020 school year.

As a result, an order for compensatory education entered, which required Falmouth to reimburse the Does for specified independent evaluation expenses, as well as the documented tuition and transportation costs the parents had incurred for John Doe's attendance at the Aucocisco School, both for the tutorial, partial-day services he received from January 28, 2019 up through September 2019, and for the 2019-2020 school year.  (A.R. 51.)

### G. Post-Hearing Developments

For the remainder of the 2019-2020 school year, John remained enrolled at Aucocisco School.  Shortly after the due process hearing, Aucocisco, like all schools in Maine, moved to remote learning due to the COVID-19 pandemic.  John's progress reports for the remainder of fourth grade nonetheless show that John continued to make some progress on his academic goals. (See Sealed Exs. 1-5 (ECF Nos. 25-1–25-5).)  In the fall of 2020, John returned to Aucocisco for fifth grade.  His first quarter report card noted, in relevant part, that out of 1,000 sight words, John had mastered reading 498 words and spelling 83 words.  (Sealed Ex. 7 (ECF No. 25-7).)  He was noted to be practicing reading at a "third grade level." (Id.)

### III.   DISCUSSION

In this appeal, Falmouth asks this Court to find error in the two findings from the due process hearing, namely: (1) John was denied a FAPE, and (2) "John's placement at Aucocisco School was sufficiently proper to support an order for reimbursement." (Pl. Brief (ECF No. 32), PageID # 161.)  The Court considers each of these arguments in turn.

### A. FAPE

As the First Circuit has explained, "determining an appropriate placement for a disabled child is . . . a complex task." <u>C.D.</u>, 924 F.3d at 630. In this case, a complex child with ADHD and dyslexia needed an educational program that allowed him to develop basic literacy skills. The hearing officer was necessarily required to make a number of credibility determinations in light of a record heavy with evaluations and various interpretations of those evaluations. However, he ultimately found that John was denied a FAPE from January 2018 to March 2019, and from September 2019 to February 2020, because Falmouth failed to offer John programming during these time periods that developed his literacy skills. Based on an independent review of the entire administrative record, the Court agrees with this finding.

### 1. January 2018 to March 2019

Focusing on the period from January 2018 to March 2019, the record reflects that John's first IEP was up for an annual review in January 2018. Despite then being in second grade, John's reading and writing skills were still at a kindergarten level. His special education teacher recognized that he had an orthographic deficit and described it as his "biggest challenge." (A.R. 442.) However, Falmouth proposed only incremental increases in the amount of specialized instruction John should receive and did not further evaluate John's orthographic issues, or reconsider the type of specialized reading instruction John might need. Falmouth also essentially abandoned the preexisting measurable reading goal when John failed to reach it. Under the IEP developed in early 2018, John's reading and writing skills essentially remained stagnant for the remainder of second grade.

Then, this stagnation in literacy skills remained an issue for John in third grade. In fact, his new special education teacher documented apparent regression. By November 2018, she was

acknowledging that John would not meet his IEP goal on sight words.  While an IEP "need not aim for grade-level advancement," it must provide "more than *de minimis* progress" from year to year."  Endrew F., 137 S. Ct. at 1001 (cleaned up).   Here, the preponderance of the evidence supports a finding that the IEP Falmouth developed for John in early 2018 failed to provide programming that would allow John to make more than de minimis progress on basic reading and writing skills over the following year.[28]

In January 2019, the Falmouth staff working with John were acknowledging that his orthographic deficit was a problem that needed to be addressed.  By this time, the Does also had obtained a private evaluation from Aucocisco, which documented John's double deficit dyslexia and made clear recommendations for changes in John's literacy programming.  In short, John, who had arrived at FES as a first grader with Pre-K level literacy skills, was now a third grader with literacy skills that remained at "pre-k to kindergarten levels." (A.R. 2609.)

Faced with well-documented concerns and minimal progress, Falmouth appeared to acknowledge a need to change and increase John's specialized programming.  However, their proposed January 2019 IEP fell short and the DPHO fairly classified Falmouth's offer of LMB programming as "too little, too late."  (A.R. 45.)  While Falmouth proposed ramping up to nine hours weekly of Seeing Stars programming, their plan for implementing this programming, including utilizing a teacher who was not certified in LMB and lacked recent experience using LMB, was, at best, a work in progress.  By contrast, the Does proposed placing John at Aucocisco for ten hours of weekly Lindamood Bell programming with certified instructors prepared to offer John Seeing Stars and LiPS.

---

[28] While Falmouth argues that "[t]his case is not only about reading," this argument is undercut by the substantial evidence that John's inability to read like his peers impacted his self-esteem and many other aspects of his education. Pl. Brief (ECF No. 32), PageID # 214.

Falmouth then responded to this parental proposal by requiring that John attend some specialized instruction outlined in his IEP during his half days at FES, despite a parental request for mainstreaming during these half days. Thus, Falmouth sought to de facto decrease the amount of time John spent in a mainstreamed environment beyond what his parents were requesting or what the IEP then contemplated. Given what was known about John's circumstances and lack of progress in January 2019, the services Falmouth offered in the January 2019 IEP were not reasonably calculated to enable him to make appropriate progress in literacy. See Endrew F., 137 S. Ct. at 1001 (holding that the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances").

### 2. September 2019 to February 2020

Turning to the fall of 2019, Falmouth again proposed amending John's IEP to add more hours of specialized instruction in reading and writing. However, Falmouth indicated that none of this specialized instruction would utilize LMB programs. Instead, Falmouth proposed that it would use "multisensory synthetic phonics instruction." (A.R. 638.) On the record then available, the Court finds this abrupt change resulted in an IEP that was not "reasonably calculated to confer a meaningful educational benefit" to John. Johnson, 906 F.3d at 194 (quoting D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 34 (1st Cir. 2012)).

Falmouth claims this change was justified based on its reading of the August 2019 Boulos evaluation.[29] But, in the Court's view, this justification is based on a selective reading of this evaluation and a failure to weigh it in the context of the then-available record. At this point in

---

[29] While Falmouth criticizes the DPHO for "his miss of the Boulos evaluation," Defendants criticize the August 2019 Boulos evaluation for its continued focus on John's phonological processing and suggest her neutrality may have been in questionable. Pl. Reply Brief, PageID # 418 & Def. Brief, PageID #s 205, 224-25. As part of its independent review, the Court has weighed the Boulos report in the context of the larger record of recent evaluations available in connection with the amendment of John's IEP in fall 2019. Notably, even Dr. Boulos was recommending that John might benefit from additional outside evaluation at that time. A.R. 620.

time, John had received approximately 100 hours of Seeing Stars programming.  An evaluation by Aucocisco during that same time period showed some slow progress;[30] more progress than John had achieved during the two years he had received SPIRE-based instruction.[31]  As the First Circuit has explained, "the relationship between speed of advancement and the educational benefit must be viewed in light of a child's individual circumstances."  Johnson, 906 F.3d at 196.  Given John's unique circumstances and history of slow progress, the Court finds Falmouth's refusal to offer John the ability to continue with additional LMB programming was unjustified.

Falmouth additionally maintains that this Court and the DPHO cannot base a denial of FAPE finding on the refusal to use a specific literacy program.  The Court agrees with this basic legal proposition.  See, e.g., M. v. Falmouth Sch. Dep't, 847 F.3d 19, 27-28 (1st Cir. 2017) (explaining that  "the IDEA does not require schools to include specific instructional methods in an IEP" and that schools may retain "a certain degree of flexibility in accomplishing the outlined objectives").  However, flexibility in methodology does not mean that a district can ignore evidence that its preferred structured literacy program has not worked and that the unique needs of a student may require school officials to provide alternative, accepted methodologies.  Here, the preponderance of the record did not support a finding that Falmouth made a "reasonable" and "data driven" decision when it amended John's IEP to remove LMB programming.  (Pl. Brief, PageID # 184.)  Rather, it appears Falmouth was eager simply to return to offering the programming that it had readily available, despite ample credible evidence that this programming did not address John's unique combination of deficits.

---

[30] See supra n.22.

[31] John progressed through only one level of this eight-level program during that time period.  As previously noted, the SPIRE program is designed to be completed over two years.  See supra n. 5.

### 3. The Least Restrictive Environment Requirement

Falmouth also attempts to press an argument before this Court that the DPHO failed to adequately consider the need for a least restrictive environment ("LRE") when evaluating the IEPs in question. See C.D., 924 F.3d at 625 (quoting Board of Educ. v. Rowley, 458 U.S. 176, 202-03 (1982)) (explaining that the IDEA's LRE requirement reflects "a 'preference' for 'mainstreaming' students with disabilities in 'the regular classrooms of a public school system.'"); see also 20 U.S.C. § 1412(a)(5)(A). In Falmouth's view, the 2018 and 2019 IEPs being challenged by the Does should be viewed as providing a FAPE given the LRE mandate to mainstream disabled students to the extent possible. As the First Circuit has previously explained, "the desirability of mainstreaming must be weighed in concert with the [IDEA]'s mandate for educational improvement." C.D., 924 F.3d at 625 (cleaned up).

Here, the "continuum of possible education environments" that was being considered for John was relatively narrow. Id. at 631 (cleaned up). At one end, the January 2018 IEP contemplated that John would be in classroom with non-disabled peers approximately 59 percent of the time and the September 2019 IEP slightly decreased that number to 53 percent of the time.[32] On the other end, the Does were seeking to have their son to spend 50 percent of his time mainstreamed at FES and the other half of his time receiving specialized instruction from Aucocisco. This difference in LRE time appears insignificant on the record presented, particularly when weighed against the clear need for educational improvement.[33] In short, having given due

---

[32] The November 2019 IEP actually contemplated amending John's LRE time to 50 percent.

[33] In fact, Falmouth arguably failed to adequately consider the LRE requirement when it insisted on supplementing the ten hours of weekly specialized instruction through Aucocisco with additional specialized instruction in reading, which would have placed John's specialized reading instruction well above the nine hours contemplated by the IEP then in place and also dropped his LRE time to below 50 percent.

consideration to IDEA's LRE mandate, the Court still concludes that the IEPs Falmouth developed in January 2018 and fall of 2019 failed to provide John a FAPE.

Having determined that the DPHO correctly concluded that John was denied a FAPE, the Court turns to the question of remedy.

### B. Proper Placement

"[T]he relief available under the IDEA is equitable and is limited to (1) future special education and related services to ensure or remedy a past denial of a FAPE; and (2) reimbursements to parents for education-related expenditures that the state ought to have borne." Doucette v. Georgetown Pub. Sch., 936 F.3d 16, 32 (1st Cir. 2019); see also Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 247 (2009) ("IDEA authorizes reimbursement for the costs of private special-education services when a school district failed to provide a FAPE and the private-school placement is appropriate."). In this case, the DPHO concluded that Aucocisco School was a proper placement for John and ordered reimbursement of specified tuition and transportation expenses "as compensatory educational services" for John having not received a FAPE from the latter half of second grade through the first half of fourth grade. (A.R. 51.) Likewise, he ordered reimbursement for certain evaluation expenses.

In the final page of their opening brief, Falmouth argues that Aucocisco School does not meet the standard for tuition reimbursement, citing the credentials of the school's staff, the amount of mainstreaming provided at Aucocisco, and the ineffectiveness of Aucocisco at "addressing John's attentional difficulties." (Pl. Brief (ECF No. 32), PageID #s 186-87.) As presented, the Court finds these arguments that Aucocisco was not a proper placement for John to be without merit. To be a proper private placement that qualifies for reimbursement, the placement generally must be "reasonably calculated to enable the child to receive educational benefit," which requires

at least "some element of the special education service missing from the public alternative." Mr. I. ex rel. L.I. v. Maine Sch. Admin. Dist. No. 55, 480 F.3d 1, 25 (1st Cir. 2007) (cleaned up); see also York Sch. Dep't v. S.Z., D. Me No. 2:13-cv-00042-NT, 2015 WL 860953, at *17 (D. Me. Feb. 27, 2015) ("The question of whether a unilateral placement is proper is viewed more favorably to the parent than the question of whether the placement was required in order to provide a free appropriate public education.") (cleaned up).   Here, the record reflects that the services John received at Aucocisco provided elements of required special education services that had been missing from the programming previously offered to John and allowed him to make progress towards grade level literacy.[34]   See, e.g., Pihl v. Massachusetts Dep't of Educ., 9 F.3d 184, 188 (1st Cir. 1993) (holding "compensatory education is available to remedy past deprivations"); Regional Sch. Unit 51 v. Doe, 920 F. Supp. 2d 168, 208 & n.14 (D. Me. 2013) (discussing tuition reimbursement as a form of compensatory education).

Likewise, the evaluation expenses sought by the Does reflect their attempt to evaluate various dimensions of John's dyslexia that were acknowledged by various members of the IEP team but not diligently investigated by Falmouth.  Thus, the Court concurs with the DPHO that these expenses were properly allowed as part of the relief awarded to the Does.[35]

The First Circuit has explained that any reimbursement ordered for a violation of the IDEA is  "a matter of equitable relief, committed to the sound discretion of the trial court." Mr. I., 480

---

[34] With respect to Falmouth's argument that Aucocisco lacked appropriate opportunities for mainstreaming, it is well established and understandable that unilateral private placements are not subject to the same type of LRE considerations that factor into a FAPE.  See, e.g., C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 837 (2d Cir. 2014).

[35] While the Court has considered the merits of evaluation reimbursement as part of the equitable remedy, it also notes that Falmouth arguably waived any objection to the evaluation expenses when it failed to develop this objection in their opening brief.  See Def. Brief (ECF No. 35), PageID # 228 & Pl. Reply Brief (ECF No. 37), PageID # 417-18; see also HSBC Realty Credit Corp. (USA) v. O'Neill, 745 F.3d 564, 577 (1st Cir. 2014) ("[T]he general rule . . . is that issues not developed in a party's opening brief are waived.")

F.3d at 23 (cleaned up).  On the record presented, the Court, in an exercise of its discretion, concludes that reimbursement of the tuition, travel, and evaluation expenses detailed in A.R. 2692 is an appropriate remedy.[36]

## IV.   CONCLUSION

For the reasons just stated, the Court AFFIRMS the April 11, 2020 Clarified Order.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 29th day of September, 2021.

---

[36] The Court notes that the hearing transcript and April 11, 2020 Clarified Order contains a reference to "Exhibit 348-A."  A.R. 51 & Tr. 198.  The administrative record contains only one expense summary labeled "P-348/A.R. 2692," which lists the Hunter evaluation and Papageorge evaluation for a total of $2,122.96 in evaluation expenses.